# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Dec 08, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of | ) | |
|---|---|---|
| METALLIC BLUE REDMI MODEL #2409BRN2CA, CURRENTLY LOCATED AT 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814 | ) ) ) ) ) | Case No.    2:25-sw-1010 CSK |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2423(c) | Engaging in Illicit Sexual Conduct in Foreign Places |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Tyler Breeding, Special Agent, HSI

*Printed name and title*

Sworn to before me and signed in my presence.

Date:    December 8, 2025

City and state:    Sacramento, California

*Judge's signature*

CHI SOO KIM, U.S. MAGISTRATE JUDGE

*Printed name and title*

ERIC GRANT
United States Attorney
NCHEKUBE ONYIMA
Special Assistant United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| In the Matter of the Search of: | CASE NO. |
|---|---|
| METALLIC BLUE REDMI MODEL #2409BRN2CA, CURRENTLY LOCATED AT 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814 | AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH DEVICE |

I, Tyler Breeding, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a Metallic Blue Redmi Model #2409BRN2CA, that was lawfully seized by federal agents and currently located in evidence at the Department of Homeland Security, Homeland Security Investigations, 650 Capitol Mall, Suite 3-100, Sacramento, CA 95814,  as of or about November 21, 2025 hereinafter the "SUBJECT DEVICE," as further described in Attachment A, for the contraband, fruits, and instrumentalities of violations of federal laws, as further described in Attachment B.

2.      I am a Special Agent with the Department of Homeland Security – Homeland Security Investigations (HSI), and have been since May of 2019.  I am currently assigned to the Homeland Security Task Force of the Sacramento Field Office of Investigations.  I have investigated criminal violations of

AFFIDAVIT                                             1

Titles 8, 18, 19, and 21 of the United States Code.  I have been cross designated by the United States Department of Justice with Title 21 Federal narcotics enforcement authority.  As an HSI special agent, I have participated in numerous investigations and search warrants related to violations of various federal laws. I am a graduate of the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training course at the Federal Law Enforcement Training Center, where I received extensive training in the investigation and criminal prosecution of Titles 8, 18, 19, and 21 cases. During this period, I received training in Title 18 investigative matters including, but not limited to, child exploitation and the travel of United States Citizens with the intent to engage in illicit sexual conduct in foreign places.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      This affidavit is submitted in connection with an investigation into the sexual abuse of a minor female victim (MFV) by United States citizen Anthony Thomas KIPP-GALATTI (hereinafter "KIPP-GALATTI") in Vietnam.  Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit there is probable cause to believe that violations of 18 U.S.C. § 2423(c) ("Engaging in Illicit Sexual Conduct in Foreign Places") have been committed by KIPP-GALATTI in Vietnam, and that a search of the SUBJECT DEVICE further described herein for the things further described in Attachment B will reveal contraband, evidence, fruits, and instrumentalities of said violations.

## II.      IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is the SUBJECT DEVICE, which is a Metallic Blue Redmi Model #2409BRN2CA, The Device is currently located at 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814.  On November 20, 2025, law enforcement assumed custody of KIPP-

///

GALATTI from Vietnamese authorities, pursuant to a warrant issued in the Eastern District of California for his arrest. At the time KIPP-GALATTI was taken into custody, the SUBJECT DEVICE was on his person and seized pursuant to his arrest by agents assigned to the HSI Ho Chi Minh, Vietnam Attaché Office.

6.     The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

### III.     LEGAL AUTHORITY

7.     18 U.S.C. § 2423(c) prohibits a U.S. citizen from traveling in foreign commerce or residing, either temporarily or permanently, in a foreign country and engaging in any "illicit sexual conduct" with another person.  "Illicit sexual conduct" includes (1) a sexual act (as defined in 18 U.S.C. § 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States; (2) any commercial sex act (as defined in 18 U.S.C. § 1591) with a person under 18 years of age; and (3) production of child pornography (as defined in 18 U.S.C. § 2256(8)).

8.     A "sexual act" is defined in 18 U.S.C. § 2426 as (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus; (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

9.     "Child pornography" is defined to include any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct.  "Sexually explicit conduct," in turn, means "actual or simulated—(i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal . . . ; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic

abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(2)(A).

### IV.    CASE BACKGROUND AND FACTS ESTABLISHING PROBABLE CAUSE

10.    On or around April 1, 2021, an HSI special agent, an HSI foreign service national investigator, and a Vietnamese Ministry of Public Security (MPS) law enforcement officer with the Khanh Hoa province police department interviewed a Vietnamese national minor female victim (MFV) believed to be 11 or at most 12 years old. As MFV was practically homeless and is cared for by an unrelated legal guardian, her exact birth date was unknown at the time of the interview.  A forensic interview of MFV was later conducted by an HSI forensic interview specialist on or around August 1, 2022. MFV's recounting of the details of her sexual assault were remarkably similar in both accounts.

11.    During her interview, MFV stated that she met KIPP-GALATTI when he came to the vending stall run by her guardian in approximately July 2020.  A few weeks after they initially met, MFV stated KIPP-GALATTI returned and promised to buy her a cell phone.  MFV said KIPP-GALATTI took her out to eat and then suggested the two rest at his hotel room before he would take her to buy some toys.  MFV said KIPP-GALATTI told her he was too busy to take her home to her guardian.

12.    In this same interview, MFV stated that, once inside the hotel room, which was later confirmed by MPS to be the Maple Hotel in Nha Trang, KIPP-GALATTI asked her to take a bath.  KIPP-GALATTI washed her outfit and gave her a robe to wear.  MFV said she later fell asleep while playing with KIPP-GALATTI's cell phone.

13.    MFV told the HSI that when she woke up, her hands and legs were spread apart and tied down.  She further stated that she started to scream, after which KIPP-GALATTI gagged her.  MFV said she saw KIPP-GALATTI removing his clothes before he blindfolded her.  MFV said she then felt pain inside her body like she had never felt before, and it lasted for two to three hours.  When asked where she felt the pain, MFV used a Vietnamese slang word for vagina, "chim." MFV said she cried after it was over and KIPP-GALATTI threatened to kill her if she told anyone what happened.

14.    MFV told the HSI that she stayed the night in the hotel room at KIPP-GALATTI's insistence and saw her guardian on the street the next morning as she was going to breakfast with KIPP-GALATTI. MFV said KIPP-GALATTI ran away from her guardian to try and check out from the hotel.

15.    Later that day, local police confronted KIPP-GALATTI and seized his passport and electronic devices and opened a criminal investigation related to the reported sexual assault of MFV.

16.    MFV also disclosed during her interview with HSI that she had vaginal pain for approximately a month after the assault and noticed blood in her urine several months later.

17.    Also, on or about April 1, 2021, officers with HSI and MPS spoke with MFV's guardian. MFV's guardian confirmed MFV's disclosures and told the agents that she reported KIPP-GALATTI to the local police after she learned MFV was with him. MFV's guardian further reported KIPP-GALATTI did not have permission to be with MFV or take her to his hotel room, and then that she had been advised that KIPP-GALATTI was seen acting strangely with MFV and offering to take MFV to his hotel room before the incident. She further reported that KIPP-GALATTI fled after he was seen with MFV the morning after the reported sexual assault and was caught by law enforcement checking out of his hotel.

18.    On or about May 5, 2021, HSI Special Agents Cory Dunne and My Bach interviewed KIPP-GALATTI about the sexual assault in Ho Chi Minh City, Vietnam. After he was advised of his rights, KIPP-GALATTI confirmed for the agents that he traveled from the United States to Vietnam in approximately late 2019. He further confirmed that, in approximately July 2020, he traveled from Ho Chi Minh City to Nha Trang—both in Vietnam—where he met MFV and bought her food and other items. KIPP-GALATTI acknowledged taking MFV to his hotel room in Nha Trang on or about July 26, 2020, and he admitted the two were both naked for some period together and spent the night together in the same bed. KIPP-GALATTI said that the two gave each other kisses on the cheek while they were together. KIPP-GALATTI also said MFV removed her robe and climbed on top of him during the night. He further acknowledged MFV was 11 years-old at the time. KIPP-GALATTI further stated that he attempted to

give money to MFV's legal guardian after the incident was reported to local police in Vietnam, which he said he did so that MFV could buy clean clothes.  KIPP-GALATTI denied sexually assaulting MFV, however.

19.    Prior to speaking with Special Agents Dunne and Bach, KIPP-GALATTI was interviewed by Vietnamese police in Knanh Hoa about the incident.  In his written statement to Khanh Hoa police, KIPP-GALATTI admitted taking a photograph of MFV while she slept in front of the vendor stall where he met first her.  He also wrote that MFV and he felt comfortable being naked together and acknowledged hugging and kissing MFV while they were in his hotel room together.  According to Vietnamese authorities, KIPP-GALATTI denied having sex with MFV but stated he did go into the bathroom to masturbate while MFV was in the hotel room.

20.    HSI obtained video surveillance footage from the Maple Hotel, which showed KIPP-GALATTI and MFV entering the hotel at approximately 2:00 p.m. on July 26, 2020, and KIPP-GALATTI renting room 515.  In additional footage, the two are seen entering their hotel room together.

21.    Khanh Hoa police officers requested the assistance of HSI in Ho Chi Minh City with forensically examining the electronic devices Vietnamese law enforcement officers seized from KIPP-GALATTI pursuant to their authority and their investigation of him for the reported sexual assault of MFV.  In or around late March or early April 2021, HSI agents met with Khanh Hoa Police in Ho Chi Minh City to provide assistance.  MPS advised HSI that MPS had not extracted any data from KIPP-GALATTI's devices.  HSI Special Agent Bach then assisted Vietnamese authorities with forensically examining a white 128 GB Transcend MicroSD XC (External Number: F20207) memory card that was inserted into KIPP-GALATTI's cell phone.  The examination of the memory card revealed, among others, the following images with the following related metadata: multiple images of KIPP-GALATTI with Asian children in public or school settings; an image focusing on the genitalia area of a minor wearing a pink dress and white underwear that was taken on or about July 24, 2020, at 3:30 p.m.; an image of the genitalia

///

area of a minor wearing loose pink shorts that was taken on or about July 24, 2020, at 1:44 p.m.; an image of MFV clothed but sleeping on a purple beach chair with her legs apart that was taken on or about July 25, 2020, at 12:04 a.m.; an image of MFV with KIPP-GALATTI at a beach that was taken on or about July 26, 2020, at 1:04 p.m., which is shortly before the two checked into the Maple Hotel.  The metadata from these images further indicate that the images were taken with a device matching the description of KIPP-GALATTI's cell phone, which Vietnamese authorities had also seized from KIPP-GALATTI.  HSI was unable to assist Vietnamese authorities with forensically examining KIPP-GALATTI's cell phone at that time.

22.     In or around December 2021, an HSI foreign service national investigator reported seeing a male who appears to be KIPP-GALATTI at a shopping mall in Ho Chi Minh City alone with a minor girl, approximately seven to ten years old.  HSI obtained video surveillance footage from the mall and determined the male was KIPP-GALATTI but did not identify the minor female.

23.     Based on my training, experience, and conversations with other law enforcement officers, I believe that the above facts are consistent with KIPP-GALATTI engaging in an increasingly common phenomenon that is referred to as child sex tourism, in which adult men from comparatively wealthy nations travel to other parts of the world—including nations in Southeast Asia, where victims are less wealthy, more vulnerable, and therefore easier to exploit—to sexually exploit minors and engage in other illegal sex acts.

24.     On October 23, 2025, a federal grand jury in the Eastern District of California returned a single count indictment charging KIPP-GALATTI with one count of 18 U.S.C. § 2423(c) and (f) which prohibits Engaging in Illicit Sexual Conduct in a Foreign Place.  An arrest warrant was issued for KIPP-GALATTI on the same day.

25. On November 20, 2025, law enforcement agents with HSI in Ho Chi Minh City, Vietnam, interviewed KIPP-GALATTI at the airport.  After he was advised of his rights, KIPP-GALATTI agreed

///

to speak with the agents.  During this interview, KIPP-GALATTI was asked about his interaction with MFV in the hotel room in July 2020 and confirmed again that, at times, they were both naked together in the hotel room.  When asked whether he thought it was appropriate to be nude with a minor in a hotel room in those circumstances, KIPP-GALATTI stated that he believed in the liberty of children; that he would not engage in any conduct with another person without that person's consent; and that MFV was precocious, was curious, and said that she liked him.  KIPP-GALATTI denied that he was alone with any other children in Vietnam but admitted that he had contact with the children of friends there.  KIPP-GALATTI was also shown image(s) during this interview that the interviewing agent described as depicting KIPP-GALATTI walking around a shopping mall with the unidentified minor female, as further set forth in paragraph 22, and "touching" the minor "on the rear."  KIPP-GALATTI acknowledged that one of the individuals was him but stated that he did not know who the other individual in the image(s) was.  He further stated that "patting someone on the butt is nothing" and is "normal" in Vietnam.

26.     On November 20, 2025, law enforcement arrested KIPP-GALATTI in San Francisco, California.

27. Prior to his arrival to San Francisco, California, KIPP-GALATTI was initially apprehended in Vietnam by law enforcement.  While apprehended in Vietnam, law enforcement seized the SUBJECT DEVICE from KIPP-GALATTI's person and has maintained custody of the device.  The Device is currently in the lawful possession of the Department of Homeland Security – Homeland Security Investigations (HSI).  The device is currently located at 650 Capitol Mall, Suite 3-100, Sacramento, CA 95814.  Therefore, while the Department of Homeland Security – Homeland Security Investigations (HSI) might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

///

///

///

## V.   EVIDENCE OF KIPP-GALATTI'S TRAVEL AND CONTACT WITH MFV ON THE SUBJECT DEVICE

28.     Based on my training, experience, and conversations with other investigators and law enforcement officers, I believe that individuals who take digital travel photos retain those images for many years after the pictures are taken on mobile phones and other digital storage devices, as those photos are evidence that the travel occurred, and digital photography makes retention and storage of such photos very easy.  In my experience, and that of others who I have spoken with, individuals frequently keep a high volume of digital travel photos on their mobile devices and other digital storage devices because the digital files are small and storage capacity is now extremely large, meaning that it is easier to simply transfer and store all of the photos onto whatever mobile or digital device the individuals are using instead of filtering out and getting rid of poorer quality photos.

29.     Further, because cameras often embed metadata in the photos by default, it is my experience that self-produced photos, particularly non-sexually explicit photos, will retain metadata that may reveal, among other things, when the photo was taken, where it was taken, and with what device it was taken.  In this case, I submit that such metadata may help establish and further corroborate the timeline of events surrounding when KIPP-GALATTI traveled to Vietnam from the United States, when and where KIPP-GALATTI met the MFV, and how frequently KIPP-GALATTI interacted with MFV and other minors in Vietnam.

30.     Accordingly, and based on my training and experience, there is probable cause to believe that evidence of the offense under investigation—a violation of 18 U.S.C. § 2423(c)—will be found on the SUBJECT DEVICE, even though KIPP-GALATTI initially traveled from the United States to Vietnam and first met MFV years ago.

31.     To prove a violation of 18 U.S.C. § 2423(c), the government must establish that a United States' citizen traveled in foreign commerce.  As discussed above, KIPP-GALATTI traveled to Vietnam in or around late 2019 and traveled to Nha Tran in particular in or around July 2020.  Evidence that is likely to exist on the SUBJECT DEVICE, including travel photos and communications with others, would corroborate that KIPP-GALATTI traveled in interstate commerce to Vietnam.  Additionally, in my training and experience, when booking travel, individuals often use cell phones or mobile devices to

1  research options and make travel arrangements.  I also know that booking travel reservations often requires

2  the traveler to enter an email, phone number, or other personal information, and often to make payment

3  (e.g., by credit card or other electronic payment platform), to finalize a reservation.  Therefore, I believe

4  that the SUBJECT DEVICE may contain additional evidence of KIPP-GALATTI using travel-related and

5  financial websites and/or mobile applications related to the commission of the offense under investigation.

6        32.    To prove a violation of 18 U.S.C. § 2423(c), the government must also establish that a

7  United States' citizen engaged in illicit sexual conduct with a minor.  As discussed above, KIPP-

8  GALATTI met MFV in Nha Trang, Vietnam, in approximately July 2020, and took multiple photographs

9  of MFV and of himself with MFV.  While some of the devices containing these photographs were taken

10  by Vietnamese authorities pursuant to their investigation of KIPP-GALATTI in 2020, I know that it is

11  easy to save such photographs to multiple digital devices and to transfer such photographs from one device

12  to another for safe keeping.  Accordingly, there is probable cause to believe that photographs of MFV or

13  of KIPP-GALATTI and MFV will be located on the SUBJECT DEVICE, which will further corroborate

14  the evidence described above.  Additionally, and as explained in more detail below, there is probable cause

15  to believe that the SUBJECT DEVICE will contain additional pictures of minors, including, potentially,

16  additional pictures of the minors who were captured in the up-skirt/up-short photos described above or

17  other minors/witnesses who could provide information or testimony related to this investigation.

18  **VI.**    **CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS, DISTRIBUTE, AND/OR PRODUCE CHILD SEXUAL ABUSE MATERIAL, AND ENGAGE IN SEXUAL**

19  **ACTIVITIES WITH MINORS**

20        33.    Based on my previous investigative experience related to child exploitation investigations,

21  and the training and experience of other law enforcement officers with whom I have had discussions, I

22  know there are certain characteristics common to individuals who possess, distribute, and/or produce child

23  sexual abuse material, and who engage in sexual activity with minors:

24        34.    Such individuals may receive sexual gratification, stimulation, and satisfaction from

25  contact with children, or from fantasies they may have viewing children engaged in sexual activity or in

26  sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature

27  describing such activity.

28        35.    Such individuals may collect sexually explicit or suggestive materials in a variety of media,

including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

36.    Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

37.    Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure, and private environment, such as a computer or password protected mobile device.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis.

38.    Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools. Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.

39.    Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including e-mail addresses), usernames/user handles, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

40.    Such individuals prefer not to be without their child pornography for any prolonged time

1   period. This behavior has been documented by law enforcement officers involved in the investigation of

2   child pornography throughout the world.

3       41.    Based on my training and experience, my conversations with other law enforcement

4   officers, and the information obtained through this investigation, I have reason to believe KIPP-

5   GALATTI, who was the owner and user of the SUBJECT DEVICE, shares the above characteristics

6   common to individuals who produce, receive, distribute, and/or possess child pornography, and/or engage

7   in sexual activity with minors, based on the following: as further detailed above, MFV disclosed to law

8   enforcement in significant detail that KIPP-GALATTI invited her to his hotel room after meeting her on

9   the street in Vietnam and sexually assaulted her in July 2020 when she was approximately 11 years old;

10  MFV's guardian corroborated that KIPP-GALATTI had taken MFV to his hotel room in July 2020 without

11  the guardian's consent and reported that KIPP-GALATTI had been seen acting inappropriately with MFV

12  and ran away after he was seen with MFV the morning after the reported sexual assault; KIPP-GALATTI

13  told law enforcement in Vietnam and HSI in Ho Chi Minh City that he took MFV to his hotel room that

14  day, that he and MFV were both naked together in his hotel room, that he knew MFV was a minor, and

15  that he kissed and hugged her and slept in the same bed as her in the hotel room; KIPP-GALATTI was

16  seen walking around Ho Chi Minh City with an individual who appeared to be a prepubescent minor and

17  no other adult; and a forensic examination of a digital storage device seized from KIPP-GALATTI by

18  Vietnamese authorities pursuant to their investigation revealed what appear to be up-skirt or up-short

19  photos focused directly on minor females' clothed genitals, an image of MVF sleeping while posed with

20  her legs spread wide apart, and images of KIPP-GALATTI with MFV, all of which appear to have been

21  taken with KIPP-GALATTI's cell phone.

22      **VII.**    <u>**TECHNICAL TERMS**</u>

23      42.    Based on my training and experience and information acquired from other law

24  enforcement officials with technical expertise, I use the following technical terms to convey the

25  following meanings:

26      a.    "Digital device," as used herein, includes the following three terms and their

27  respective definitions:

28  ///

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)    "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)    "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.    "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones

///

send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d. A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those

///

signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

   e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

   f. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

   g. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

/ / /

/ / /

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.

///

Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is

///

independent of the file name; that is, any change in the name of the file will not change the hash value.

ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

o.    "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q. "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to

///

///

private computer systems.  It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

43. Based on my training, experience, and research, I know that the SUBJECT DEVICE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## VIII.    ELECTRONIC STORAGE AND FORENSIC ANALYSIS

44.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

45.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, there is probable cause to believe that the items described in Attachment B will be stored in the SUBJECT DEVICE for at least the following reasons:

a.    Individuals who engage in criminal activity, including engaging in illicit sexual conduct with minors and the related conduct involving the possession and potential production of images focused on the genitals of minors described above, frequently use their digital devices to communicate with their victims and like-minded offenders; to produce, send, receive, and save sexually explicit visual depictions and other visual depictions of minors; to make payments associated with criminal activity, and to save contact information and calendar appointments, as well as to obtain and save geographic information, associated with minors.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.    Digital device files, or remnants of such files, can be recovered months or even

1    many years after they have been downloaded onto the medium or device, deleted, or viewed via the

2    Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even

3    when such files have been deleted, they can be recovered months or years later using readily-available

4    forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart

5    phone, or a memory card, the data contained in the file does not actually disappear; rather, that data

6    remains on the storage medium and within the device unless and until it is overwritten by new data.

7            d.    Therefore, deleted files, or remnants of deleted files, may reside in free space or

8    slack space – that is, in space on the digital device that is not allocated to an active file or that is unused

9    after a file has been allocated to a set block of storage space – for long periods of time before they are

10   overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a

11   "swap" or "recovery" file.

12           e.    Wholly apart from user-generated files, computer storage media-in particular,

13   computers' internal hard drives-contain electronic evidence of how a computer has been used, what it

14   has been used for, and who has used it.  To give a few examples, this forensic evidence can take the

15   form of operating system configurations, artifacts from operating system or application operation, file

16   system data structures, and virtual memory "swap" or paging files.  Computer users typically do not

17   erase or delete this evidence, because special software is typically required for that task.  However, it is

18   technically possible to delete this information.

19           f.    Similarly, files that have been viewed via the Internet are automatically downloaded

20   into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of

21   electronic storage medium space devoted to these files, and the files are only overwritten as they are

22   replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an

23   electronic file from a digital device depends less on when the file was downloaded or viewed than on a

24   particular user's operating system, storage capacity, and computer, smart phone, or other digital device

25   habits.

26           46.    Forensic Evidence.  As further described in Attachment B, this application seeks

27   permission to locate not only electronically stored information that might serve as direct evidence of the

28   crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT DEVICE

was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT DEVICE because:

a)     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.

b)     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c)     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d)     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e)     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the

user.

        f)    I know that when an individual uses a digital device to engage in illicit sexual activity with a minor, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

47.    <u>Nature of Examination.</u> Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

48.    <u>Manner of Execution.</u> Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

## IX.   CONCLUSION

2   49.   I submit that this affidavit supports probable cause for a search warrant authorizing the

3   examination of the SUBJECT DEVICE described in Attachment A to seek the items described in

4   Attachment B.

5   Respectfully submitted,

6

7   /s/

8   Tyler Breeding
    Special Agent
    Department of Homeland Security – Homeland
9   Security Investigations (HSI)

10

11

12   Subscribed and sworn to before me on:   December 8, 2025

13

14

15   THE HONORABLE CHI SOO KIM
     UNITED STATES MAGISTRATE JUDGE

16

17

18

19   Approved as to form by SAUSA NCHEKUBE ONYIMA

20

21

22

23

24

25

26

27

28

**<u>ATTACHMENT A</u>**

The property to be searched is a METALLIC BLUE REDMI MODEL #2409BRN2CA, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 2423(c) as described in the search warrant affidavit, including, but not limited to:

2.      All records on items described in Attachment A that relate to violations of 18 U.S.C. § 2423(c) and involve Anthony Thomas KIPP-GALATTI, including:

      a.   Visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

      b.   Video recordings of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

      c.   Visual depictions or video recordings of KIPP-GALATTI with MFV or other minors in Vietnam;

      d.   Information, electronic records, or correspondence pertaining to the possession, receipt, distribution, or production of visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

      e.   Information, electronic records, or correspondence pertaining to the solicitation or enticement of minors, or to engaging in illicit sexual conduct with minors as that term is defined by 18 U.S.C. § 2423;

      f.   Information, electronic records, or correspondence relating to the sexual abuse of a child, engaging in sexual activity with minors, or having a sexual interest in minors;

      g.   Information, electronic records, or correspondence relating KIPP-GALATTI's travel to and in Vietnam;

      h.   Address/phone books or contact information, including address/phone books or contact information that reflect names of potential criminal associates or victims;

      i.   Call logs and text messaging content;

      j.   Information regarding social-networking Internet sites and participants in such sites or networks, as well as internet usage records, usernames, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

k.  Correspondence including, but not limited to electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

l.  Records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

m.  Credit card information, including bills and payment records showing subscriptions, membership payments, purchases, or sales of visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or for access to such material;

n.  Evidence of who used, owned, or controlled the Subject Device at the time the things described in this warrant occurred or were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, electronically-stored photographs, and correspondence;

o.  Evidence of software, or the lack thereof, that would allow others to control the Subject Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

p.  Evidence of the attachment to the Subject Device of other storage devices or similar containers for electronic evidence;

q.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Subject Device;

r.  Evidence of the times the Subject Device was used;

s.  Passwords, encryption keys, and other access devices that may be necessary to access the Subject Device;

t.  Documentation and manuals that may be necessary to access the Subject Device or to conduct a forensic examination of the Subject Device;

u.  Records of or information about Internet Protocol addresses used by the Subject Device;

v.   Records of or information about the Subject Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

w.   Any and all stored information that can be retrieved and investigated for evidentiary value, inculpatory or exculpatory, and/or identify co-conspirators, and identify any investigatory leads.

3.     Records and communications pertaining to KIPP-GALATTI's travel to and in Vietnam, including but not limited to U.S. Passports, travel tickets, photos and photo albums depicting travel, receipts, and communications with MFV or other individuals in Vietnam.

4.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| METALLIC BLUE REDMI MODEL #2409BRN2CA, CURRENTLY LOCATED AT 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814 | ) ) ) ) ) | Case No.    2:25-sw-1010 CSK |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ California _____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____ December 22, 2025 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐  Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐  for _____ days *(not to exceed 30)*  ☐  until, the facts justifying, the later specific date of _____.

Date and time issued:      December 8, 2025 at 8:53 a.m.

*Judge's signature*

City and state:      Sacramento, California          CHI SOO KIM, U.S. MAGISTRATE JUDGE

*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| | |
|---|---|
| **Return** | |

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____

_____
Signature of Judge                                                                                    Date

## **ATTACHMENT A**

The property to be searched is a METALLIC BLUE REDMI MODEL #2409BRN2CA, hereinafter the "SUBJECT DEVICE." The SUBJECT DEVICE is currently located at 650 CAPITOL MALL, SUITE 3-100, SACRAMENTO, CA 95814.

This warrant authorizes the forensic examination of the SUBJECT DEVICE for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 2423(c) as described in the search warrant affidavit, including, but not limited to:

2.      All records on items described in Attachment A that relate to violations of 18 U.S.C. § 2423(c) and involve Anthony Thomas KIPP-GALATTI, including:

     a.  Visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

     b.  Video recordings of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

     c.  Visual depictions or video recordings of KIPP-GALATTI with MFV or other minors in Vietnam;

     d.  Information, electronic records, or correspondence pertaining to the possession, receipt, distribution, or production of visual depictions of child pornography and minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or of child erotica;

     e.  Information, electronic records, or correspondence pertaining to the solicitation or enticement of minors, or to engaging in illicit sexual conduct with minors as that term is defined by 18 U.S.C. § 2423;

     f.  Information, electronic records, or correspondence relating to the sexual abuse of a child, engaging in sexual activity with minors, or having a sexual interest in minors;

     g.  Information, electronic records, or correspondence relating KIPP-GALATTI's travel to and in Vietnam;

     h.  Address/phone books or contact information, including address/phone books or contact information that reflect names of potential criminal associates or victims;

     i.  Call logs and text messaging content;

     j.  Information regarding social-networking Internet sites and participants in such sites or networks, as well as internet usage records, usernames, logins, passwords, e-mail addresses and identities assumed for the purposes of communication on the Internet, billing, account, and subscriber records, chat room logs, chat records, membership in online groups, clubs or services, connections to online or remote computer storage, and electronic files;

k.   Correspondence including, but not limited to electronic mail, chat logs, and electronic messages, establishing possession, access to, or transmission through interstate or foreign commerce, including by United States mail or by computer, of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

l.   Records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions of any kind involving the transmission through interstate or foreign commerce including by United States mail or by computer of any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

m.  Credit card information, including bills and payment records showing subscriptions, membership payments, purchases, or sales of visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or for access to such material;

n.   Evidence of who used, owned, or controlled the Subject Device at the time the things described in this warrant occurred or were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, electronically-stored photographs, and correspondence;

o.   Evidence of software, or the lack thereof, that would allow others to control the Subject Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

p.   Evidence of the attachment to the Subject Device of other storage devices or similar containers for electronic evidence;

q.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Subject Device;

r.   Evidence of the times the Subject Device was used;

s.   Passwords, encryption keys, and other access devices that may be necessary to access the Subject Device;

t.   Documentation and manuals that may be necessary to access the Subject Device or to conduct a forensic examination of the Subject Device;

u.   Records of or information about Internet Protocol addresses used by the Subject Device;

v.  Records of or information about the Subject Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

w.  Any and all stored information that can be retrieved and investigated for evidentiary value, inculpatory or exculpatory, and/or identify co-conspirators, and identify any investigatory leads.

3.  Records and communications pertaining to KIPP-GALATTI's travel to and in Vietnam, including but not limited to U.S. Passports, travel tickets, photos and photo albums depicting travel, receipts, and communications with MFV or other individuals in Vietnam.

4.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.